UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MEGAN BARROS,

                      Plaintiff,

    -v-

NATIONAL RAILROAD PASSENGER CORPORATION
D/B/A AMTRAK,

                      Defendant.

CIVIL ACTION NO.: 18 Civ. 3394 (VSB) (SLC)

**OPINION AND ORDER**

**SARAH L. CAVE**, United States Magistrate Judge.

## I.    INTRODUCTION

Plaintiff Megan Barros ("Barros"), now represented by pro bono counsel in this personal injury action, has reached a settlement in principle with Defendant National Railroad Passenger Corporation d/b/a Amtrak ("Amtrak").  Before the Court is the motion of Marc R. Thompson ("Thompson"), Barros's former attorney of record, seeking to recover from the settlement disbursements and attorneys' fees pursuant to a charging lien under New York Judiciary Law Section 475.  (ECF No. 54-1 ¶ 3) (the "Fees Motion").  Barros disputes that Thompson is owed any attorneys' fees because he did not withdraw from her representation for good cause.  (ECF No. 59).  The Honorable Vernon S. Broderick has referred this dispute to the undersigned for resolution.  (ECF No. 57).

## II.   BACKGROUND

### A. Factual Background

#### 1. Undisputed facts

On April 14, 2017, while Barros was waiting for a train on the Amtrak platform at Penn Station, an Amtrak police officer discharged a taser resulting in a stampede on the platform.  (ECF No. 1).  Barros was pushed to the ground and sustained injuries to her hip.  (Id.)

On July 10, 2017, Barros retained the law firm of Pulvers, Pulvers & Thompson LLP ("Pulvers"), of which Thompson is a named partner, on a contingency basis to prosecute a lawsuit for her injuries and agreed to pay Pulvers one third of any recovery in the action (the "Retainer Agreement").  (ECF No. 54-1 at 2).

#### 2. Disputed facts

##### a. Commencing the action

Thompson attests that on July 10, 2017, the same day Barros retained Pulvers, his office sent a claim letter to Amtrak seeking disposition of Barros's claims.  (ECF No. 54-1 ¶ 7).  On July 18, 2017, Amtrak responded in writing that it would not honor Barros's claim because it had determined that "no liability exist[ed] on the part of Amtrak relating to the incident."  (ECF No. 54-4 at 2).  Thompson states that between being retained and filing the action, his office conducted extensive investigations, and sought to obtain pertinent medical records and reports of treating physicians.  (ECF No. 61 ¶ 7).

Barros attests that on December 18, 2017, after having no substantive contact with Thompson since initially meeting him, she sent him an email asking about her case and did not receive a response.  (ECF No. 60 ¶ 2).  On January 31, 2018, more than a month later, she again

emailed Thompson requesting an update on her case.  (Id.)  On March 27, 2018, more than three months after she first sought an update from Thompson, Barros was able to speak to him about commencing a lawsuit against Amtrak.  (Id.)

On April 3, 2018, nine months after Amtrak responded to Thompson's letter, Pulvers filed suit against Amtrak in New York State Supreme Court for New York County.  (ECF No. 54-1 ¶ 9). On April 18, 2018, the matter was removed to this Court because suits involving Amtrak, an entity created by Congress (49 U.S.C. § 24101 et seq.), arise under federal law.  (ECF No. 1).  See 28 U.S.C. § 1331.

### b.  Discovery

Over the next 16 months, Thompson alleges that he conducted "voluminous discovery" including the "exchange of documents and medical records" and took the depositions of Barros and the Amtrak officer who discharged the taser.  (ECF No. 54-1 ¶ 11).

Barros attests that Thompson did not communicate with her, took minimal discovery, and failed to help her understand her case and options for proceeding.  (ECF No. 60 ¶ 1).  Barros alleges that Thompson failed to timely respond to Amtrak's interrogatories until two days before the deadline to complete depositions.  (Id. ¶ 5).  She avers that due to Thompson's unnecessary delays, the parties had to request multiple extensions of time, and that her deposition was cancelled three times because Thompson failed to obtain the pertinent medical records.  (Id.)

Barros states that Thompson spent very little time preparing her for her deposition, and only took one other deposition, of the Amtrak police officer who discharged his taser.  (ECF No. 60 ¶¶ 6–7).  Thompson responds that Barros "got as much as she needed to prepare," given that the facts of the underlying incident were not in dispute.  (ECF No. 61 ¶ 10).  Thompson blames

the breakdown in the attorney-client relationship as the reason for not pursuing more discovery.
(Id. ¶ 11).

### c.  Settlement negotiations

Thompson states that soon after the close of depositions, Amtrak make a $17,500 settlement offer (the "First Offer"). (Id. ¶ 12).  Thompson alleges that he communicated the First Offer and personally advised Barros that he believed he could improve it, but warned her that her claim was limited because Amtrak had determined that its officer acted reasonably in discharging his taser, and that he did not believe they could establish liability based on the crowding on the platform.  (ECF No. 54-1 ¶ 12).  Thompson states that Barros rejected the First Offer because she believed her claim to be worth more, and that he told her that she could consult with other counsel if she desired.  (Id.)  Thompson avers that "at no time did [he] tell Ms. Barros that if she did not accept the settlement [he] would withdraw as her attorney" and that if Barros had chosen to continue to litigate the case he would have done so.  (Id. ¶ 13).

Barros describes a much different version of events.  She explains that on May 29, 2019, Thompson sent her an email attaching the transcript of the Amtrak police officer's deposition with no cover explanatory message.  (ECF No. 60 ¶ 10).  She states that when they spoke, Thompson informed her about the First Offer and told her to read the deposition because he thought it would make her settle.  (Id.)

Barros alleges that on June 3, 2019, Thompson told her that she "needed to take the settlement or find another attorney."  (ECF No. 60 ¶ 12).  Barros states that she spoke with Thompson again on June 5, 2019, at which time he "belittled" her case, berated her, and again told her to take the settlement or find new counsel.  (Id. ¶ 13).

On June 27, 2019, Thompson sent Barros an email asking, "Do you have a new lawyer yet?"  (ECF No. 60 ¶ 15).  On July 2, 2019, Barros replied and explained that she was having trouble finding a new lawyer because the date for depositions and documents requests had passed.  (Id. ¶ 16).  In her email Barros acknowledged Thompson's frustration, but maintained that she still had many questions and needed his assistance.  (Id.)

On July 3, 2019, Thompson replied to Barros's email, addressed some of her questions, and then stated "I still believe that you will lose your case and if you don't get a new lawyer or settle I will make a motion to be relieved from the case."  (ECF No. 60 ¶ 17).

On July 12, 2019, Thomson wrote to Barros and asked, "what is going on with your search for a new lawyer?"  (ECF No. 60 ¶ 19).  Barros alleges that Thompson then bullied her in a subsequent call when she tried to ask questions specifically about discovery, and noted that other attorneys she had spoken to believe the case would benefit from additional discovery.  (Id.)

On July 17, 2019, Barros again emailed Thompson asking if it was possible to request more time for discovery and listed documents still needed from Amtrak.  (ECF No. 60 ¶ 20).  Thompson replied, "In my opinion, there is no more discovery needed.  Please find a new attorney immediately."  (Id.)

Thompson denies that he ever told Barros he would not represent her if she did not accept the offer or that he belittled her case.  (ECF No. 61 ¶¶ 3, 14).  He states that her case was extremely difficult to litigate, and that despite the legal impediments, he worked to obtain an offer of settlement from Amtrak.  (Id. ¶¶ 13–14).  He states that he only inquired about new counsel because there were procedural steps to be taken if she did.  (Id. ¶ 14).

### d. **Thompson's withdrawal**

Thompson attests that his doubts about the likelihood of success of Barros's case and the

value of a further settlement offer "were not well received," and that it was at this point in the

litigation that he realized he and Barros had irreconcilable differences that led him to move to

withdraw as her counsel of record.  (ECF No. 54-1 ¶ 16).

On August 26, 2019, Judge Broderick granted Thompson's motion to withdraw as counsel.

(ECF No. 31).  Thereafter, Thompson advised the Court that Pulvers was asserting a charging lien

under Judiciary Law § 475 against any settlement in the case.  (ECF No. 30).

On November 14, 2019, Judge Broderick ordered the Clerk of Court to attempt to locate

pro bono counsel to represent Barros at a settlement conference.  (ECF No. 37).  On

December 17, 2019, the New York Legal Assistance Group ("NYLAG") entered a limited

appearance on behalf of Barros.  (ECF No. 39).

## B. **Procedural History**

On February 22, 2020, Judge Broderick referred this action to the undersigned to conduct

a settlement conference. (ECF No. 41).  This Court scheduled a settlement conference for April 6,

2020 (ECF No. 44), which was later adjourned to June 16, 2020.  (ECF No. 46).

On May 13, 2020, NYLAG, on behalf of Barros, informed the Court that Barros and Amtrak

had reached an agreement to resolve all issues in the case for $20,000 (the "Final Offer").  (ECF

No. 47).  The letter, addressed to Judge Broderick, also informed the Court that Thompson was

asserting a charging lien against the settlement, and requested that the dispute be referred to

the undersigned for a settlement conference.  (Id.)  NYLAG informed the Court that Barros has

been unable to finalize the settlement agreement with Amtrak while the fee dispute is pending. (Id.)

On May 28, 2020, this Court converted the June 16, 2020 settlement conference between Barros and Amtrak to address the fee dispute between Barros and Thompson.  (ECF No. 50).  The Court conducted the conference, but the parties were not able to reach an agreement.  (ECF entry June 16, 2020).  The Court then directed Thompson to file the Fees Motion.  (ECF No. 53).

On August 14, 2020, Thompson filed the Fees Motion, alleging that Pulvers is entitled to one-third of the First Offer plus expenses.  (ECF No. 54).  Specifically, Pulvers seeks total payment of $7,102.53, representing its legal fees of $5,833.33 (33 1/3% of $17,500) plus disbursements of $1,269.90.  (ECF No. 54-2 at 4).

Barros has offered to pay Pulvers' disbursements of $1,269.90 but objects to the payment of the legal fees because Thompson improperly withdrew from his representation.  (ECF No. 59 at 4).  Barros alleges that Thompson neglected the attorney-client relationship, abandoned her when she did not want to accept the First Offer, hampered her ability to retain new counsel, and thereby forfeited Pulvers's right to a contingency fee.  (Id.)

### III.   DISCUSSION

#### A.  Legal Standards

##### 1.  Charging liens

New York Judiciary Law Section 475 allows attorneys to assert a charging lien, enforceable against the recovery of former clients, as a means of securing compensation for services that produced that recovery.  In relevant part, the statute provides:

> [f]rom the commencement of an action, special or other proceeding in any court
> or before any state, municipal, or federal department, . . .  the attorney who

appears for a party has a lien upon his or her client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, award, settlement, judgment or final order in his or her client's favor, and the proceeds thereof in whatever hands they may come. . . . The court upon petition of the client or attorney may determine and enforce the lien.

N.Y. Jud. Law § 475.

Courts have consistently held that charging liens under Section 475 are "enforceable in federal courts in accordance with its interpretation by New York Courts." Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 449 (2d Cir. 1998).  Charging liens attach when the action is commenced and provide the attorney with an equitable security interest in any favorable result of the litigation. Id. at 449–50.

An attorney who withdraws from a matter is still entitled to enforce a charging lien so long as he had "good cause" to withdraw.  Pettiford v. City of Yonkers, No. 14 Civ. 6271 (JCM), 2020 WL 1331918, at *3 (S.D.N.Y. Mar. 20, 2020); see also Itar-Tass Russian News Agency, 140 F.3d at 451 ("[P]articipation in the proceeding at one point as counsel of record is a sufficient predicate for invoking the statute's protection."); Perez v. Progenics Pharm., Inc., 204 F. Supp. 3d 528, 553 (S.D.N.Y. 2016) ("An attorney's permitted withdrawal from representation of a party does not affect his entitlement to the statutory lien under Section 475." (internal citation omitted)).

### 2.  **Withdrawal from representation**

Where an attorney withdraws from an action for "good cause," the charging lien is set at "the fair and reasonable value of the services rendered, determined at the time of the [withdrawal] and computed on the basis of quantum meruit."  Pettiford, 2020 WL 1331918, at

*3 (quoting Winkfield v. Kirschenbaum & Phillips, P.C., No. 12 Civ. 7424 (JMF), 2013 WL 371673, at *2 (S.D.N.Y. Jan. 29, 2013)).

Because Thompson resigned from representing Barros, he has the burden of establishing that he had good cause to withdraw. Guzik v. Albright, No. 16 Civ. 2257 (JPO), 2019 WL 3334487, at *9 (S.D.N.Y. July 25, 2019). "Under New York law, good cause for withdrawal exists where there are irreconcilable differences with respect to the proper course to be pursued in the litigation, where the client flatly challenged counsel's loyalty and professional integrity, or where the relationship between plaintiffs and their attorney has deteriorated to the point where further representation is inappropriate." Karimian v. Time Equities, Inc., No. 10 Civ. 3773, 2011 WL 1900092, at *4 (S.D.N.Y. May 11, 2011) (internal citation omitted).

### 3. Quantum Meruit

"Whether quantum meruit is invoked for the purpose of fixing a charging lien or as an independent basis for recovery of unpaid attorney's fees, the reasonable value of the services provided is not fixed by strictures of the fee agreement[.]" Innovative Biodefense, Inc. v. VSP Techs., Inc., No. 12 Civ. 3710 (ER), 2020 WL 2317446, at *4 (S.D.N.Y. May 11, 2020). The amount of a charging lien is determined through a quantum meruit analysis, which requires "ascertaining the reasonable value of the legal services rendered up to the date of the [party's] substitution of new counsel." Sequa Corp. v. GBJ Corp., 156 F.3d 136, 148 (2d Cir. 1998).

To assess the reasonable value of the legal services rendered, the Court considers a number of factors, including "the difficulty of the matter, the nature and extent of the services rendered, the time reasonably expended on those services, the quality of performance by counsel, the qualifications of counsel, the amount at issue, and the results obtained (to the extent

known)."  Sequa Corp., 156 F.3d at 148; Purchase Partners, LLC v. Carver Fed. Sav. Bank, No. 09

Civ. 9687 (JMF), 2014 WL 462823, at *3 (S.D.N.Y. Feb. 5, 2014).  "Although the court is not bound

by the parties' retainer agreement, such an agreement may guide the court in determining the

reasonable value of the services rendered."  Figueroa v. City of New York, No. 05 Civ. 9594 (JGK),

2011 WL 5547976, at *3 (S.D.N.Y. Nov. 15, 2011) (citing Stair v. Calhoun, 722 F. Supp. 2d 258,

268–69 (E.D.N.Y. 2010)).  Nonetheless, a retainer agreement is "subject to the limitation that,

because a charging lien is an equitable remedy, the amount of the lien must be 'fair'[.]"  Id. (citing

Sutton v. N.Y.C. Transit Auth., 462 F.3d 157, 161 (2d Cir. 2006)); Agence France Presse v. Morel,

No. 10 Civ. 2730 (AJN), 2015 WL 13021413, at *8 (S.D.N.Y. Mar. 23, 2015), aff'd sub nom. Presse

v. Morel, 645 F. App'x 86 (2d Cir. 2016).  "The determination of the reasonable value of the

attorney's services is a matter within the sound discretion of the trial court."  Sequa Corp., 156

F.3d at 149.

### B. Application

#### 1. Thompson withdrew for good cause

Having considered the evidence in the record and having assessed the credibility of

Thompson and Barros during the settlement conference, the Court finds that Thompson had

good cause to withdraw as counsel for Barros.  Karimian, 2011 WL 1900092, at *4 ("Under New

York law, good cause for withdrawal exists where there are irreconcilable differences with

respect to the proper course to be pursued in the litigation [and] where the client flatly

challenged counsel's loyalty and professional integrity[.]" (internal citations omitted)).

The emails attached to Barros's declaration illustrate that Barros and Thompson were in

conflict about the nature of the case, that he was encouraging her to take the First Offer, and

that their disagreement about the continued course of the litigation gave Thompson cause to withdraw. (ECF No. 60 at 5–14). The Court finds credible Thompson's assertions that Barros questioned his ability to pursue the case and that they had disagreements on how to proceed with the case, especially as to discovery and the value of a further settlement offer. (ECF No. 54-1 ¶¶ 12, 16, 22). "While there were conflicts between [counsel and client], as well as differences in strategy, there was no significant breach of a legal duty" by Thompson. Joffe v. King & Spalding LLP, 337 F. Supp. 3d 366, 369–70 (S.D.N.Y. 2018), aff'd sub nom. Joffe v. Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, P.C., No. 19-3516-CV, 2020 WL 5494489 (2d Cir. Sept. 11, 2020) (summary order). Rather, the record reflects that Thompson performed at least the minimum of his legal duties in this case, albeit in a manner with which Barros disagreed.

Nevertheless, the Court also notes that Thompson's communications with Barros were at times terse and Barros may have justifiably perceived it as abrasive and as pressuring her to accept the First Offer. (ECF No. 60 at 5–14).

### 2.  Attorneys' fees pursuant to quantum meruit

Because the Court finds that Thompson withdrew for cause, it must now assess "the reasonable value of the legal services rendered up to the date of the [party's] substitution of new counsel." Sequa Corp., 156 F.3d at 148. The Fees Motion does not address the factors this Court must consider in this analysis, and does not provide any documentation regarding the hours Thompson expended on this case. Thompson conclusorily argues that one-third of the First Offer, plus Pulvers's disbursements, pursuant to the Retainer Agreement is "reasonable" and thus the Court should order fees in that amount. (ECF No. 54-2).

Despite the Retainer Agreement, the Court must assess the reasonable value of the services provided.  See Innovative Biodefense, Inc., 2020 WL 2317446, at *4 ("Whether quantum meruit is invoked for the purpose of fixing a charging lien or as an independent basis for recovery of unpaid attorney's fees, the reasonable value of the services provided is not fixed by strictures of the fee agreement[.]").  In assessing a reasonable value of the services performed, courts may employ a "lodestar" analysis.  The Dweck Law Firm, L.L.P. v. Mann, No. 03 Civ. 8967 (SAS), 2004 WL 1794486, at *3 (S.D.N.Y. Aug. 11, 2004).  In a lodestar analysis, the Court estimates the attorneys' fees by "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate."  Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany, 369 F.3d 91, 95 (2d Cir. 2004) (internal citations omitted).  This rate "is to be calculated according to the prevailing market rates in the relevant community."  Id.

"[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates," Hensley v. Eckerhart, 461 U.S. 424, 437 (1983), and "courts may reduce or decline to award costs altogether where counsel fails to proffer documentation of the expenses."  Mango v. BuzzFeed, Inc., 397 F. Supp. 3d 368, 375 (S.D.N.Y. 2019) (citing  BWP Media USA Inc. v. Uropa Media, Inc., No. 13 Civ. 7871, 2014 WL 2011775, at *4 (S.D.N.Y. May 16, 2014) (taking judicial notice of a filing fee but disregarding all other costs for lack of documentation)).  Percentage reductions of rates are also appropriate as a "practical means of trimming fat" from a fee application.  New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1142, 1146 (2d Cir. 1983) (allowing percentage reductions to correct for deficiencies in fee application including "inadequate detail in documentation").

Applying these factors in light of the entire record, the Court finds that the amount Pulvers seeks, $7,102.53, representing its legal fees of $5,833.33 (33 1/3% of $17,500) plus disbursements of $1,269.90, is unreasonable.  This case did not present complex issues or require extensive discovery.  As Thompson acknowledges, the underlying facts of the incident were not in dispute, but rather the principal question was of Amtrak's liability.  (ECF No. 61 ¶ 10). Thompson took just one deposition that lasted approximately 90 minutes and defended one other (Barros's).  (ECF No. 54-1 ¶ 11).  Thompson obtained minimal discovery and his delays in responding to Amtrak's discovery requests caused Barros's deposition to be rescheduled three times.  (ECF No. 60 ¶ 1).  The Fees Motion was the only motion practice before the Court, apart from extension requests.  Although Thompson did negotiate one settlement offer, the record reflects that he was frustrated when Barros did not accept it, did not appear to negotiate for a higher offer, and thereafter withdrew his representation in frustration.

Here, Thompson has not informed the Court of his hourly rate, estimate the number of hours he expended on Barros's case, or provide any evidence of his costs and expenses.  This impedes the Court's ability to assess the reasonable value of the work performed.  Based on these deficiencies in the Fees Motion and its review of the entire record of Thompson's performance in this case, the Court finds that a 30% reduction in the amount of fees and costs requested is appropriate.  See Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic, No. 10 Civ. 05256 (KMW) (DF), 2012 WL 5816878, at *11 (S.D.N.Y. Nov. 14, 2012) ("Courts frequently respond to vague and difficult-to-decipher billing statements with an across-the-board percentage reduction in the fees claimed, often in the range of 20–30 percent."); Carey, 711 F.2d at 1146; Kirsch v. Fleet St. Ltd., 148 F.3d 149, 173 (2d Cir. 1998) (affirming 20%

fee reduction for vagueness and other deficiencies in attorney billing records); Terminate Control

Corp. v. Horowitz, 28 F.3d 1335, 1342–43 (2d Cir. 1994) (holding 30% fee reduction for "lack of

specific record keeping" was within the district court's discretion); Suchodolski Assocs., Inc. v.

Cardell Fin. Corp., Nos. 03 Civ. 4148, 04 Civ. 5732 (WHP), 2008 WL 5539688, at *2 (S.D.N.Y. Dec.

18, 2008) (collecting cases applying percentage reductions of up to 30%).   "Fee reductions

around 30% are . . . common in this District to reflect considerations of whether work performed

was necessary, leanly staffed, or properly billed."  Beastie Boys v. Monster Energy Co., 112 F.

Supp. 3d 31, 57 (S.D.N.Y. 2015) (collecting cases).  Thus, the Court will apply a 30% reduction of

the requested legal fees and disbursements.

*     *     *

Accordingly, the Court orders that Barros pay Pulvers, out of the Final Offer, a total of

$4,972.00, comprised of:

1.   $4,083 in legal fees (70% of the requested $5,833.33); and

2.   $889 in disbursements (70% of the requested $1,269.90).

### IV.   CONCLUSION

For the foregoing reasons, the Fee Motion is GRANTED in part and DENIED in Part.  Barros

shall remit $4,972.00 to Pulvers from the Final Offer.  The parties are directed to meet and confer

the manner in which this amount is to be paid in order to facilitate the consummation of the

settlement agreement with Amtrak.

Dated:      New York, New York
            November 10, 2020

SARAH L. CAVE
United States Magistrate Judge